**CLERK'S OFFICE**
**A TRUE COPY**
Jan 12, 2021
s/ Daryl Olszewski
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21 MJ 18 |
| Information associated with Facebook User ID 100051102587153 that is stored at premises controlled by Facebook | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which the court has jurisdiction pursuant to 18 USC 2703 and 27011 and FRCrP 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(g)(1) | felon in possession of firearm or ammunition |
| 18 USC 231(a)(3) | interference with an officer during commission of a civil disorder |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Christopher Nichos
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date: January 12, 2021

_____
*Judge's signature*

City and state: _____ Milwaukee, WI _____

U.S. Magistrate Judge William E. Duffin
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Nichols, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since January 2020. I am currently assigned to the Milwaukee Division's Joint Terrorism Task Force, where I investigate violations of federal law. I have investigated and assisted in the investigation of matters involving violations of federal law related to domestic terrorism and anti-riot laws. Previously, I spent 14 months as a judicial clerk in Hennepin County Minnesota where I served as a judicial clerk for a Minnesota State Court Judge on a felony criminal rotation. I have a bachelor's degree in Business Administration and a Juris Doctor degree.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 231(a)(3) (committing an act intended to obstruct, impede, or interfere with a law enforcement officer lawfully engaged in the lawful performance of his official duties incident during the commission of a civil disorder) and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition) have been committed by Ashton HOWARD. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

**PROBABLE CAUSE**

5.      On Sunday, August 23, 2020, Jacob Blake was shot multiple times by an officer of the Kenosha Police Department (KPD). That incident triggered both non-violent protests and violent rioting during the evening of August 23, 2020, and the ensuing days, including numerous arsons throughout the City of Kenosha. The unrest and violence grew so dangerous that the Wisconsin National Guard eventually deployed over 1,000 individuals to keep the peace. The Government also marshaled its resources to investigate crimes in the aftermath.

6.      On the evening that Blake was shot, a crowd began to gather near the location of the shooting near the 2800 block of 40th Street in Kenosha, Wisconsin. Throughout the course of the evening, certain people in the crowd grew increasingly agitated and began damaging KPD and Kenosha Sheriff's Department (KSD) vehicles. Members in the crowd also began to throw various objects at the law enforcement officers on scene. At approximately 2110 hours, KPD Captain Thomas Hamm was assisting other KPD officers with moving an unsecured, badly damaged, running squad car that still contained a loaded shotgun. The squad car was parked on 40th Street near the 2800 block in Kenosha, Wisconsin, and had been damaged by people in the crowd.

2

7.     Captain Hamm[1], stood in front of the squad car as another KPD officer attempted to operate the squad car away from the crowd. As the squad car was slowly being moved away from the crowd on 40th Street, the crowd encroached upon the officers, preventing them from moving forward. The officers were unable to gain distance away from the crowd, at which point some type of incendiary device was thrown in the direction of the officers and the squad car, which burst into flames near the rear of the vehicle. Immediately after the incendiary device was thrown, another object was projected toward the officers and the squad car causing glass to break. As Captain Hamm turned his head to see what caused the glass to break, an object struck him in the back of the head.

8.     When KPD Officer Zamborini heard a loud thud, she turned around to see Captain Hamm instantly stiffen up and fall forward onto his face. Officers immediately began to render aid to Captain Hamm. Captain Hamm's eyes were open, but glassy and glazed over. Captain Hamm was bleeding from the head and unresponsive but breathing. It was believed Captain Hamm was struck with either a brick or a large chunk of asphalt. Officers on scene immediately turned Captain Hamm over, moved him closer to the squad car for safety, and radioed "Officer down!" Additional officers arrived to provide security as the officers on scene were outnumbered. Tactical Response Team (TRT) members arrived to provide a barrier between the law enforcement officers on scene and the crowd so Captain Hamm could safely be extracted and transported to the hospital.

---

[1] Previous affidavits have described Captain Hamm as dressed in full City of Kenosha Police uniform. Captain Hamm was wearing a vest marked "POLICE," but he was not dressed in full uniform.

9.     A particular FBI confidential source, hereinafter designated as CHS #1,[2] told law enforcement that s/he knew of a person known to boast to other people that he was the individual who struck a police officer in the head with a brick during the recent protests and riots in Kenosha. CHS #1 did not know the name of the individual, but on or around October 21, 2020, CHS #1 provided case agents the phone number 630-624-7752 as the phone number belonging to this person. Law enforcement agents would later use this phone number to identify the individual boasting he struck a police officer in the head with a brick as Ashton HOWARD.

10.     CHS #1 stated to law enforcement that HOWARD used his cell phone to show CHS #1 and others a video that HOWARD had shared on his Facebook page that showed a police officer being struck in the head by a brick. According to CHS #1, HOWARD claimed to CHS #1 and others that he threw the brick. HOWARD also showed CHS #1 where he (HOWARD) can be seen in the video and where his voice can be heard.

11.     Case agents believe phone number 630-624-7752 was the phone number being utilized by HOWARD on and around August 23, 2020. On October 21, 2020, CHS #1 placed a phone call to HOWARD at phone number 630-624-7752 in front of law enforcement agents. CHS #1 has placed multiple recorded phone calls to phone number 630-624-7752 between November 17, 2020, and December 3, 2020, in which CHS #1 spoke to HOWARD. CHS #1 provided case agents HOWARD's Facebook display name, "Opp Poppa."

---

[2] For several reasons, case agents believe CHS #1 to be credible and reliable regarding the statements made to law enforcement about this incident. First, CHS #1 has been providing continuous information to law enforcement since October 2020. Second, key portions of CHS #1's information have been corroborated through independent investigation, including surveillance and information from other sources as set forth in this affidavit. CHS #1 is cooperating for monetary compensation and has prior felony convictions for burglary. CHS #1 is currently on state supervised release.

4

12.     On October 23, 2020, case agents requested preservation of the Facebook account associated with the Facebook user ID (UID) 100051102587153 (hereinafter "Opp Poppa"). On October 28, 2020, case agents served legal process on Facebook, requesting information associated with the Facebook account Opp Poppa. On November 17, 2020, in response to the legal process, Facebook provided the Facebook account Opp Poppa was created on May 12, 2020 and was associated with the telephone number 630-624-7752.

13.     CHS #1 told case agents that HOWARD, a convicted felon,[3] sold guns and that CHS #1 observed a firearm on HOWARD on multiple occasions in the past few months. CHS #1 also said that HOWARD expressed that he wanted to kill law enforcement officers, and that HOWARD was part of a "stick up crew" responsible for committing robberies.

14.     During the October 21, 2020 phone call that CHS #1 placed to HOWARD at phone number 630-624-7752 in front of law enforcement agents, CHS #1 offered to buy a .22 caliber firearm from HOWARD. HOWARD stated he could not sell the firearm because he was on his way to Milwaukee to handle a situation.

15.     As noted above, CHS #1 provided case agents HOWARD'S Facebook display name, "Opp Poppa." On or around October 22, 2020, case agents observed a photograph on the "Opp Poppa" Facebook page of a person matching the physical description of HOWARD holding a firearm by his face and pointing the firearm upwards. The posting stated that the photograph was posted to Facebook on May 12, 2020.

---

[3] Records show that HOWARD was convicted in U.S. District Court for the Western District of Louisiana, Case No. 16-CR-72, of the felony offense of possessing stolen firearms in violation of 18 U.S.C. 922(j) and 924(a)(2). HOWARD was sentenced to 27 months in prison. Judgement was entered by the court on September 16, 2016.

16.     On November 17, 2020, CHS #1 placed a recorded phone call to HOWARD at phone number 630-624-7752. During this conversation, CHS #1 told HOWARD that s/he knew a person who needed to purchase a firearm and had $450 to buy one. HOWARD told CHS #1 that he would need to call his friend to see if they would sell him a .45 caliber firearm. HOWARD asked CHS #1 if they were actually going to sell a firearm to the person trying to buy one or just rob the person.

17.     On November 20, 2020, CHS #1 placed a recorded phone call to HOWARD at phone number 630-624-7752. During this conversation, HOWARD stated his Facebook account had been taken down. As noted above, case agents know HOWARD'S Facebook account as display name "Opp Poppa" and UID 100051102587153. CHS #1 told HOWARD the reason CHS #1 believed his Facebook account was taken down was because he had posted that video of the police officer getting hit in the head with a brick. HOWARD responded by stating he did not know anything about that. However, based on my training and experience, I believe HOWARD was likely lying about not knowing anything about the brick incident. As noted, HOWARD had previously brought up the brick incident with CHS #1. And, during the same phone call, HOWARD talked about how he was locked up in prison for three years because someone told on him. HOWARD stated he did not talk much because there were a lot of "rats" around there. Through my training and experience I know a "rat" to be someone who informs police of illegal activity.

18.     During the phone call with CHS #1 on November 20, 2020, HOWARD displayed an attitude of violence toward law enforcement. HOWARD talked about a traffic stop that CHS #1 was involved in. HOWARD used the phrase "12" which, through my training and experience,

6

I know is commonly used as a term for the police. HOWARD said he thought CHS #1 was going to get on "12." HOWARD told CHS #1 that CHS #1 needed to hold on and do it right when they were parked, so that they could run up and ambush them. HOWARD talked about the element of surprise and wanted to catch the police when they were sleeping.

19.     On December 17, 2020, a Kenosha Police Department confidential source, hereinafter designated as CHS #2[4], told law enforcement that s/he knew of a person known to her/him as "Smoove" who would boast to other people that he was the individual who struck a police officer in the head with a brick during the recent riots and protests in Kenosha. When shown a photo array, CHS #2 identified a photograph of HOWARD as "Smoove." CHS #2 stated s/he was walking with a group of people that included HOWARD the day after Jacob Blake was shot by KPD officers. According to CHS #2, while the group was walking, HOWARD told CHS #2 that he was the person who struck that a police officer in the head with a brick. HOWARD then showed CHS #2 a video on his cell phone, where the camera was pointed at HOWARD'S face and he is seen throwing something. The camera then turns around to show a police officer laying on the ground before other law enforcement officers drag the body out of the view of the camera.

20.     CHS #2 stated that s/he was with HOWARD on or about August 24, 2020, at the protest for the officer-involved shooting of Jacob Blake and observed a firearm on HOWARD'S

---

[4] For several reasons, case agents believe CHS #2 to be credible and reliable regarding the statements made to law enforcement about this incident. First, CHS #2 has been providing reliable information to KPD law enforcement officers since October of 2019. Second, key portions of CHS #2's information have been corroborated through independent investigation, including surveillance and information from other sources, as set forth in this affidavit. CHS #2 has prior convictions for disorderly conduct, obstruction, battery, damage to property and felony theft. CHS #2 is providing information to KPD in exchange for a reduction in criminal charges. CHS #2 reported this incident to law enforcement officials separate from CHS #1 and CHS #3.

7

person. CHS #2 stated HOWARD was wearing black pants, a black hooded sweatshirt, and black shoes on the evening of August 24, 2020.

21.     On October 20, 2020, another FBI confidential source, hereinafter designated as CHS #3[5], told law enforcement that s/he knew of a person known to boast to other people that he was the individual who struck a police officer in the head with a brick during the recent protests and riots in Kenosha. CHS #3 stated s/he was in a car with a group of people that included the individual later identified as HOWARD sometime during the protests in the days after Jacob Blake was shot by KPD officers. While in the car, HOWARD stated he was the person who struck the police officer in the head with a brick. According to CHS #3, HOWARD showed CHS #3 a video on his cell phone of a police officer being struck with the brick and claimed he was the person that threw the brick. CHS #3 also said that while the group was in the vehicle, HOWARD brandished a firearm in front of CHS #3, stated he was going to kill a law enforcement officer that evening, and stated that law enforcement officers needed to die.

22.     On October 26, 2020, CHS #3 showed case agents a screenshot from the Facebook profile page of "Opp Poppa," of a video posted on August 26, 2020, with the caption

───────────────

[5] For several reasons, case agents believe CHS #3 to be credible and reliable regarding the statements made to law enforcement about this incident. First, CHS #3 has been providing continuous information to law enforcement since October 2020. Second, key portions of CHS #3's information have been corroborated through independent investigation, including surveillance and information from other sources, as set forth in this affidavit. CHS #3 is cooperating for monetary compensation. CHS #3 has prior convictions for operating a vehicle without a valid driver's license. CHS #3 knows CHS #1. CHS #3 initially approached case agents independent of CHS #1 and told them s/he knew of an individual claiming to have thrown the brick at the police officer.

CHS #3 suggested that case agents contact CHS #1 because CHS #1 and CHS #3 were both present when HOWARD first told them he threw the brick at the police officer. CHS #3 was present when CHS #1 first spoke to case agents on or around October 21, 2020.

"#Officer #hit #with #a #brick #blm# #jacob# #blake." A screenshot[6] of this Facebook post is below:



23.     As described above, law enforcement has confirmed HOWARD utilized phone number 630-624-7752. On December 9, 2020, US Magistrate Judge Stephen C. Dries, Eastern District of Wisconsin, signed search warrant 20-M-478 (SCD) for historical cell site location

---

[6] Law enforcement officers were not able to view the video posted on the Facebook page of "Opp Poppa." However, I am familiar with the video the screenshot is taken from and know from watching that video that it shows an object striking Captain Hamm in the head. The video does not show who threw the object that struck Captain Hamm.

information associated with AT&T phone number 630-624-7752. In response to the warrant, AT&T provided location data between August 23, 2020, and August 30, 2020. This data showed that phone number 630-624-7752 has been an active, pre-paid account since approximately November 13, 2019. A device, an LG model LM-X210APM (Phoenix 4) with IMEI 35543710289693, was associated with this account between August 23, 2020, and August 30, 2020. A review of the cell site location information showed that the device used a cell tower during the evening of August 23, 2020, that provides coverage, among other places, in the 2800 block of 40th Street in Kenosha, Wisconsin. This was the evening and vicinity of the incident with KPD Captain Hamm. In response to additional legal process served on AT&T for subscriber information between May 1, 2020, and November 16, 2020, AT&T provided records that show account with phone number 630-624-7752 was associated with the same IMEI and make and model of phone between approximately August 14, 2020, and November 16, 2020.

24.     In response to the warrant, AT&T provided location data between August 23, 2020, and August 30, 2020. This data showed that phone number 630-624-7752 has been an active, pre-paid account since approximately November 13, 2019. A device, an LG model LM-X210APM (Phoenix 4) with IMEI 35543710289693, was associated with this account between August 23, 2020, and August 30, 2020.

25.     On December 30, 2020, the U.S. District Court for the Eastern District of Wisconsin, U.S. Magistrate Judge Stephen C. Dries, approved and issued a search warrant for, among other items, the premises of 5025 26th Avenue, Kenosha, Wisconsin, 53140, and the person of Ashton Howard. Case No. 20-MJ-508 (SCD). On the morning of January 4, 2021, law enforcement agents executed that warrant. During execution of the warrant, agents recovered,

among other items an LG model LM-X210APM (Phoenix 4) cell phone associated with telephone number 630-624-7752. A review of the Phoenix 4 cell phone's SD card revealed, among other information, the following:

    a. A screenshot of a video of the Captain Hamm incident with a created date of August 24, 2020.

    b. Various photos of a firearm and a photo of a person matching the physical description of HOWARD holding a firearm with a created date of November 5, 2020.

    c. A slow-motion video depicting the moment Captain Hamm was struck in the head by an object with a created date of November 28, 2020.

26. On December 8, 2020, case agents served legal process on Facebook for records related to Facebook account Opp Poppa from May 1, 2020 to December 8, 2020. In response to the legal process, Facebook provided information on January 6, 2021, that included, among other things, the following:

    a. Facebook account Opp Poppa was registered on May 12, 2020 and uploaded photos on the same day at 17:38:07 UTC and 14:27:34 UTC.[7]

    b. Facebook account Opp Poppa sent attachments on August 24, 2020 at 15:47:27 UTC, 15:48:12 UTC, 15:48:13 UTC and 15:48:48 UTC. [8]

---

[7] On or around October 22, 2020, agents viewed the public part of Facebook account on Opp Poppa and observed a picture of what appeared to be HOWARD holding a firearm that was posted on May 12, 2020, as detailed earlier in the affidavit.

11

c. Facebook account Opp Poppa received a private message from "Michelle [info redacted]" on August 24, 2020 at 02:23:28 UTC.

d. Facebook account Opp Poppa uploaded a photo on August 24, 2020 at 16:02:52 UTC.[9]

e. Facebook account Opp Poppa uploaded a video on August 27, 2020 at 04:21:10 UTC.[10]

f. Facebook account Opp Poppa sent an attachment on November 6, 2020 at 03:13:55 UTC.[11]

g. Facebook account Opp Poppa uploaded a video on November 28, 2020, at 15:03:43 UTC.[12]

27. In my training and experience, I know that many people attending protests during a period of civil unrest often record activity using cameras on their cellular telephones. This includes recordings of property damage, injuries to persons, and civilian and law enforcement

---

[8] KPD police reports indicated Captain Hamm was struck in the head with an object around the timeframe of 9:10 p.m. CST on the evening of August 23, 2020.

[9] When reviewing the SD card taken from HOWARD'S LG Phoenix 4 phone, agents observed a screenshot of a video of the Captain Hamm incident that was created on August 24, 2020.

[10] A screenshot from the Facebook account Opp Poppa provided by CHS #3 shows a picture of a frame from a video of the Captain Hamm incident dated August 26, 2020, as referenced earlier in this affidavit.

[11] When reviewing the SD card taken from HOWARD'S LG Phoenix 4 phone, agents observed various photos of a firearm and a photo of a person matching the physical description of HOWARD holding a firearm with a created date of November 5, 2020, as referenced earlier in this affidavit.

[12] When reviewing the SD card taken HOWARD'S LG Phoenix 4 phone, agents observed a slow-motion video depicting the moment Captain Hamm was struck in the head by an object with a created date November 28, 2020, as referenced earlier in this affidavit.

interactions that occurred during the period of civil unrest. Such recordings are often stored on the cellular telephones and shared via the internet, including on platforms such as Facebook. As discussed above, CHS #1, CHS #2, and CHS #3 reported that HOWARD showed them a video or videos on his phone of a police officer being struck in the head with a brick while HOWARD claimed he was the individual who threw the brick.

## INFORMATION ABOUT FACEBOOK

28.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

30.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

13

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

14

to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

34. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

15

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

40. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

16

43.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

17

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

46.     Based on the foregoing, I request that the Court issue the proposed search warrant.

47.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

18

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

    49.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

19

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID 100051102587153 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from May 12, 2021 to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from May 12, 2020 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from May 12, 2020 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from May 12, 2020 to present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)    The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)    All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)    All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

10 days of issuance of this warrant.

3

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 231(a)(3) (committing an act intended to obstruct, impede, or interfere with a law enforcement officer lawfully engaged in the lawful performance of his official duties incident during the commission of a civil disorder) and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition) involving Ashton Howard since May 12, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Firearms, ammunition, and firearms-related parts and accessories;

(b) Protesting, rioting, and/or destruction of property in or around Kenosha Wisconsin, or attempts to do so, the identification of individuals associated with such activities, and/or preparatory steps in furtherance of such activities;

(c) Obstructing, interfering, or impeding law enforcement or attempts to do so, the identification of any individuals associated with such activities, and/or preparatory steps in furtherance of such activities;

(d) Law enforcement officers, agents, and/or activities;

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(f) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____       _____
Date                                                        Signature

2